# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BIVIAN TATE, | ) | |
| | ) | No. 12 CV 7765 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | June 24, 2014 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Bivian Tate seeks disability insurance benefits ("DIB"), 42 U.S.C. §§ 416(i), 423, and supplemental security income ("SSI"), *id.* §§ 1382, 1382c(a)(3)(A), based on her claim that she is unable to work because she suffers from disabling depression, anxiety, and fibromyalgia. After the Commissioner of Social Security denied her applications, Tate brought this suit seeking this court's review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Tate's motion for summary judgment is denied and the Commissioner's motion is granted:

### Procedural History

On April 21, 2008, Tate filed applications for a period of disability, DIB, and SSI, claiming a disability onset date of April 9, 2008. (Administrative Record "A.R."

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

16, 79-87.)  After her claims were denied initially and upon reconsideration, (id. at 34-38), Tate requested and was granted a hearing before an Administrative Law Judge ("ALJ").  On January 6, 2011, the assigned ALJ denied Tate's applications for DIB and SSI.  (Id. at 31.)  When the Appeals Council denied Tate's request for review, (id. at 6-8), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).  On September 27, 2012, Tate filed the current suit seeking judicial review of the Commissioner's decision.  *See* 42 U.S.C. § 405(g).  The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c).

## Facts

In 2008, when Tate was 49 years old, she stopped working as an overnight stock clerk at a department store.  According to Tate, she stopped working because she was experiencing numbness and tingling on the left side of her body and her hands and arms were "giving out" on her, making it impossible for her to do things like lift and unload packages.  (A.R. 449-50.)  Tate claims that based on a combination of those physical symptoms and her depression, she is no longer able to work in any capacity.  At her hearing before the ALJ, Tate presented both documentary and testimonial evidence in support of her claims.

## A.    Medical Evidence

In April 2008 Tate reported to the emergency room at the John H. Stroger Hospital in Chicago complaining of left-side facial numbness and occasional dizziness and light-headedness.  (A.R. 340, 343.)  A CT scan of her head revealed

"no definite abnormalities," (id. at 338), but Tate was admitted overnight for observation. Dr. Vijaiganesh Nagarajan examined Tate but determined that there was no "clear organic cause" for her complaints. (Id. at 336.) Dr. Nagarajan described Tate as being very anxious and wrote that her history was "very inconsistent." (Id.) He noted that Tate was under a lot of financial and family stress and opined that her condition was likely attributable to somatoform disorder. (Id.) Resident physician Dr. Shailendra Sharma also described Tate as providing a "[v]ery inconsistent history," noting that she "keeps changing her story." (Id. at 346.) Dr. Sharma wrote that "[d]espite plenty of subjective complaints my exam revealed no clear objective neurologic findings." (Id.) She described Tate's symptoms as "[a]natomically inconsistent and changing." (Id.) Dr. Sharma noted that Tate reported being under a lot of personal stress, and that admission combined with the lack of objective explanation for her condition led her to recommend that Tate be evaluated by a psychiatrist on an outpatient basis. (Id.) Attending physician Dr. John O'Brien also examined Tate and noted that her motor strength was at 5/5 in all extremities and although she complained of decreased grip strength, "she does not drop anything." (Id. at 352-53.) He wrote that Tate "is not depressed but under a great deal of stress." (Id. at 353.)

In May 2008 Tate returned to Stroger for a follow-up examination with Dr. Nagarajan. He noted that she was taking Tramadol and acetaminophen for her pain and described her as again providing a "very inconsistent history." (Id. at 333.) Dr. Nagarajan wrote that Tate reported that her symptoms had not improved but

that she did not have any "new problems." (Id.) Dr. Nagarajan examined Tate and reported that she was "[n]ot actively holding fingers tight on left side when requested," but that she was "[u]sing her left arm to push up and sit in examination table." (Id. at 334.) Dr. Nagarajan concluded that her multiple neurological symptoms were not "fitting with any anatomical diagnosis" and were likely attributable to a somatoform disorder. (Id.) Accordingly, he recommended that Tate see a psychiatrist. (Id.)

In July 2008 Tate was evaluated by consulting psychiatrist Dr. Sharon Kobak in connection with her disability claim. (Id. at 378.) Tate told Dr. Kobak that she was experiencing depression at a level of 9/10, that she had crying spells, and that she felt jittery and overwhelmed. (Id. at 379-80.) Dr. Kobak conducted a number of tests to evaluate Tate's sensorium and mental capacity. Tate was able to recall four digits forward correctly but stated that she could not concentrate enough to recall digits backwards. (Id. at 380.) Tate said there are five weeks in a year and could only name three large cities in the United States. (Id.) She made mistakes calculating serial threes. (Id.) Dr. Kobak concluded that Tate is "very depressed" and "overwhelmed with family problems and health issues." (Id. at 381.)

The following month Dr. Nagarajan again evaluated Tate, noting that she was under a lot of stress because of family problems and a lack of income. (Id. at 372-73.) He noted that she was wearing a left wrist splint and wanted him to further investigate what she reported as a prior diagnosis of carpal tunnel syndrome. (Id. at 373.) Dr. Nagarajan wrote that she was complaining of left finger

numbness but that the "sensory deficit" does not "correspond to any nerve territories." (Id. at 373.) He also noted that although his office had booked a psychiatry appointment for Tate, she had not attended the appointment. (Id.) Dr. Nagarajan wrote that he would arrange for nerve conduction studies, (id), and in the fall of 2008 Tate underwent an EMG study of her left hand, (id. at 384). The doctor performing the study reported that there was no evidence of nerve entrapment or cervical radiculopathy. (Id.)

On January 16, 2009, two state doctors examined Tate in connection with her disability claim. Dr. Edmond Yomtoob performed a psychiatric evaluation and reported that she "appeared to be, at the very least, exaggerating some of her symptoms." (Id. at 401.) When he asked if she had experienced abuse in the past, Dr. Yomtoob noted that Tate paused and "it appear[ed] that she was generating stories at the time." (Id.) Dr. Yomtoob wrote that Tate "was well mannered and forthcoming throughout the interview," but said that at "times she was overly elaborative in her responses and [it] appeared that she was exaggerating information." (Id. at 402.) He noted that she did not appear "to be working to the best of her ability" when asked to perform calculations, and that it was unclear whether she understood the directions for performing serial threes and sevens because instead she "simply counted backwards from 100 or 20." (Id.) Dr. Yomtoob concluded that Tate suffered from depression, but it appeared to him that she was exaggerating some of her symptoms. (Id. at 403.)

Dr. Fauzia Rana examined Tate and evaluated her physical condition. During the examination Tate complained of pain in her back, joints, and muscles throughout her body, said that she has difficulty raising her arms or bending down, and described trouble sitting or standing for more than 10 minutes at a time. (Id. at 404.) She also complained of difficulty gripping and a tingling sensation in her hands. (Id.) Upon examining Tate Dr. Rana noted that she displayed normal muscle strength and a full range of motion in her upper and lower extremities. (Id. at 406.) She wrote that Tate's grip strength was strong and equal bilaterally. (Id.) She observed that Tate had no difficulty squatting and arising, walking on her toes and heels, or getting on or off the exam table. (Id. at 407.) Accordingly, she wrote that Tate "is able to sit, stand and walk, lift, carry and handle objects." (Id.)

The medical evidence also includes residual functional capacity ("RFC") assessments submitted by Dr. Nagarajan and Dr. Gartel, a psychiatrist. (Id. at 203, 207, 429.) At the bottom of Dr. Nagarajan's RFC he wrote "Form filled in as patient requested to fill it up for her." (Id. at 207.) He described her diagnoses as multiple neurological complaints, back pain, and a history of fibromyalgia, and wrote that depression and anxiety impact her physical condition. (Id.) Dr. Nagarajan opined that her symptoms would occasionally interfere with her attention and concentration and checked boxes indicating that she can sit, stand, or walk for about two hours in an eight-hour work day. (Id. at 208.) He checked a box saying that Tate has significant limitations with reaching, handling, or fingering, and

wrote in the space for explanation that "patient says it hurts on her hands and arms if she tr[ies] to do some work." (Id. at 209.)

Dr. Gartel filled out two mental impairment RFC forms on Tate's behalf. Although there are no accompanying medical records detailing Tate's visits with Dr. Gartel, she wrote in the December 2008 RFC that they had engaged in monthly visits since October 2008. (Id. at 203.) Dr. Gartel described Tate's symptoms to include sleep and mood disturbances, emotional lability, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, and social withdrawal or isolation. (Id.) She checked boxes indicating that these symptoms left her with poor or no ability to maintain attention for two-hour segments, maintain regular attendance, complete a normal work day or week, perform at a consistent pace, or respond appropriately to criticism, changes in the work setting, or normal work stress. (Id. at 205.) In particular, she rated Tate as having frequent deficiencies in concentration, persistence, or pace and as suffering from repeated episodes of decompensation. (Id. at 206.) Dr. Gartel submitted an RFC with similar findings in June 2010. (Id. at 429-32.)

## B.    Tate's Hearing Testimony

During her October 2010 hearing before the ALJ, Tate described her work history, symptoms, and daily activities. Tate testified that she had previously worked as a machine operator at a newspaper company and as an overnight stock clerk for various department stores, where she was required to lift heavy boxes. (A.R. 442, 446.) She said that the work "took a toll" on her body until she could no

longer reach, lift, unload, or pick things up.  (Id. at 449.)  She quit her last job in 2008 because she started experiencing numbness on her left side and could no longer perform the required tasks.  (Id. at 449-50.)  Tate testified that she went to see a doctor about her numbness and was told that she had experienced a mild stroke.  (Id. at 450.)  At the time of the hearing, the only doctors Tate was seeing were a doctor who treats her hand pain and Dr. Gartel, who she said treats her depression.  (Id. at 460.)

Tate testified that her depression is rooted partly in stress stemming from her physical pain and her responsibilities at home, which include caring for her husband who is undergoing dialysis treatments.  (Id. at 453.)  She gets some support from her adult son and daughter who live in her home.  (Id.)  Tate testified that she spends her days sitting and reading or lying down in bed.  (Id. at 456.)  She said that she can no longer cook, clean, shop, or do laundry.  (Id.)  She sleeps a lot in the morning because she has trouble sleeping at night.  (Id. at 464.)  Tate said that sometimes she paces around the house for up to an hour, but later said that she can only walk for a block before she has to stop.  (Id. at 465, 467.)  She also said that she is unable to lift anything heavier than a cup.  (Id. at 465-66.)

## C.    The Vocational Expert's Testimony

Vocational expert ("VE") Lee Knutson also testified at the hearing, answering the ALJ's questions about Tate's past work and the kinds of jobs a person with certain hypothetical limitations could perform.  The VE characterized Tate's past work as including the occupations of stock clerk, personal assistant, and packaging

machine operator. (A.R. 472.) The latter job is unskilled work performed at the medium level of exertion. (Id.) The ALJ asked the VE to assume an individual of Tate's age, education, and work history, who could lift and carry 50 pounds occasionally and 25 pounds frequently, and who could stand, walk, and sit for about six hours in an eight-hour day with normal rest periods. (Id. at 473-74.) The VE testified that this hypothetical person could perform all three of Tate's past jobs. (Id. at 474.) The ALJ than asked the VE to assume that the same hypothetical individual is "unable to understand, remember, and carry out detailed and complex job instructions, is not suited for work requiring intense focus or concentration for extended periods, and may have occasional contact with the general public." (Id.) The VE testified that those restrictions would eliminate skilled or semi-skilled work, but would leave "the simple, unskilled job of packaging machine operator" on the table. (Id. at 475.) The VE also testified that someone with the RFC described by Dr. Gartel would not be employable. (Id. at 476.) Tate's attorney declined the opportunity to ask the VE any follow-up questions. (Id. at 477.)

## D.     The ALJ's Decision

After hearing the proffered evidence, the ALJ concluded that Tate is not disabled within the meaning of the Social Security Act. (A.R. 31.) In applying the standard five-step sequence for assessing disability, *see Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), the ALJ found at steps one and two that Tate has not engaged in substantial gainful activity since April 9, 2008, and that she suffers from severe impairments including affective disorder, status post hysterectomy, and a

report of a history of fibromyalgia, (A.R. 18-19). At step three the ALJ applied the special technique for analyzing mental impairments and concluded that Tate's condition is not presumptively disabling. (Id. at 19.) The ALJ found that Tate has "at most" a mild restriction in activities of daily living, "mild moderate" limitations in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id.) The ALJ further found that Tate has not suffered from any episodes of decompensation of extended duration. (Id.)

Because he concluded that Tate's conditions neither meet nor equal any of the listings set forth by the Commissioner, he turned to the question of Tate's RFC. *See* 20 C.F.R. § 404.1520(e). The ALJ concluded that Tate has the RFC to perform medium work with the limitation that she "is unable to understand, remember and carry out detailed and complex job instructions; is unsuited for requiring intense focus and concentration for extended periods and may have occasional contact with the general public." (A.R. 20.) The ALJ explained that he found the information Tate provided to be not entirely reliable, describing what he perceived as several inconsistencies in her statements. (Id. at 28.) The ALJ also found that the state consulting physicians' findings are entitled to greater weight than the RFC assessments submitted by Drs. Gartel and Nagarajan, noting that there is no medical evidence to back up Dr. Gartel's "conclusory statements" and pointing out that Dr. Nagarajan's form "specifically notes that it was completed and filled out as the claimant requested it be filled in for her." (Id. at 29.)

Turning to step four of the sequential analysis, the ALJ concluded based on the RFC assessment and the VE's testimony that Tate is capable of performing her past relevant work as a packaging machine operator.  (Id. at 30.)  Accordingly, the ALJ concluded that Tate is not disabled and denied her applications for benefits. (Id. at 31.)

## Analysis

In an appeal from the denial of social security benefits this court is limited to asking whether the Commissioner's decision is free of legal error and supported by substantial evidence.  *See Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004). This court is not "free to replace the ALJ's estimate of the medical evidence" with its own, but rather will check to ensure that the ALJ built "an accurate and logical bridge" from the record to his conclusion.  *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotation omitted).  In other words, as long as the ALJ's decision is supported by substantial evidence it will be upheld even if reasonable minds could disagree as to whether an alternate position is supportable. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

Tate raises three main arguments in this appeal.  First, she attacks the ALJ's credibility analysis, arguing that he committed a number of errors in concluding that she was exaggerating her symptoms.  Next she challenges the RFC analysis, arguing that the ALJ's analysis of her mental impairments is not supported by the evidence and asserting that he erroneously discounted Dr. Nagarajan's opinion regarding her RFC.  Finally, Tate argues that the ALJ's conclusion that she can

return to her past relevant work as a packaging machine operator lacks support. The government filed a cross-motion for summary judgment, arguing that the ALJ's decision as a whole is supported by substantial evidence.

## A.    Credibility Analysis

Tate has a particularly challenging burden to overcome in seeking reversal based on the ALJ's credibility assessment because this court is empowered to reject the credibility determination only if it is "patently wrong," meaning lacking "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Because the "ALJ is in the best position to determine a witness's truthfulness," this court will "affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004). Here the ALJ did that in spades, thoroughly walking through a host of reasons to explain his conclusion that Tate's allegations are less than fully credible. Those reasons include, among others, discrepancies between what Tate described as her daily activities at the hearing and in written disability reports, several doctors' observations that she appeared to be exaggerating her symptoms or giving inconsistent statements, an absence of the type of treatment one would expect for a disabled individual, a lack of corroborating objective evidence, and her description of her pain-related limitations in terms "so extreme as to appear implausible." (A.R. 27-29.)

In challenging the ALJ's explanations, Tate engages in the kind of nit-picking and second-guessing that the substantial evidence standard precludes. *See Castile*

*v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). For example, she argues that in concluding that Tate's pain descriptions are implausible, the ALJ erred in stating as an example of exaggeration her testimony that she is unable to lift anything heavier than a Styrofoam cup. (A.R. 28.) According to Tate, her testimony that she is unable to hold a Styrofoam cup described a gripping issue, not a lifting issue. Although there is some ambiguity in the conversation as relayed in the transcript, one interpretation is that Tate described dropping a Styrofoam cup directly in response to the ALJ's question regarding her lifting capacity, but then backpedaled when confronted with the likely weight of a Styrofoam cup and agreed that she could lift it. (Id. at 465-66.) Another supportable interpretation of the conversation is the one that Tate endorses: that said she is unable to lift a mug but can lift a Styrofoam cup. (Id.) But it is not up to this court to reweigh the conversation, *see Rice*, 384 F.3d at 369, and either way, especially given the objective evidence showing that Tate's grip strength was normal, (id. at 352, 406), the ALJ was well within his discretion to find that her testimony on this point was exaggerated, *see, e.g., Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (noting that "an ALJ will often have solid grounds for disbelieving a claimant" who describes agonizing levels of pain). The ALJ cited the Styrofoam cup testimony as just one example of why he found that her pain description "has been so extreme as to appear implausible."[2] (A.R. 28.) And even if the ALJ characterized Tate's testimony with

---

[2] The ALJ spattered other examples elsewhere in his opinion. For example, he noted that Tate said her pain precluded her from walking more than a block while also testifying that she paced in her house for an hour or more. (A.R. 27.) He noted

respect to her lifting ability unfairly, because he gave numerous other supported reasons for assigning her testimony little weight, the credibility determination survives. *See Halsell v. Astrue*, 357 F.3d 717, 722 (7th Cir. 2009) (noting that not all of an ALJ's decisions for rejecting a claimant's testimony "must be valid as long as *enough* of them are" (emphasis in original)); *see also Berger*, 516 F.3d at 544 (noting that an outlying misread of the record does not deprive an otherwise supported ALJ decision of an adequate basis).

Similarly, Tate invites the court to reweigh the evidence by arguing that the ALJ erred in accepting Dr. Yomtoob's opinion that she was exaggerating her symptoms without considering that Dr. Kobak described similar symptoms but did not consider them exaggerated. But the ALJ explicitly noted that Dr. Yomtoob was not the only doctor who considered Tate's descriptions of her symptoms to be unreliable. (A.R. 28.) The ALJ's finding on this point is supported by the records of several doctors from Stroger Hospital who found her inconsistent statements to be suspect. (Id. at 336, 346.) According to Tate, the Stroger doctors' comments should be read in view of their recommendation that she seek psychiatric help, which she views as meaning that her inconsistent statements could be attributed to a mental-health issue. But the fact that her doctors could not identify an organic cause for her complaints and thus recommended that she seek help identifying a possible

---

that she reported to one doctor that her pain was "unbearable" and at a level of 10 out of 10 when reaching, but documented the objective evidence showing that she had a full range of motion in her upper extremities in 2009 and 2010. (Id. at 25-26.) The ALJ also observed that at least one doctor expressly noted that Tate appeared to be exaggerating the severity of her symptoms. (Id. at 25.)

psychological one does not detract from their observation that her history was "inconsistent" or that she kept "changing her story." (See id. at 346.) In other words, the fact that the doctors believed that her pain could be attributable to fibromyalgia and therefore require psychiatric intervention does not diminish their expectation that Tate would provide a consistent history of her symptoms. The ALJ was entitled to view several doctors' observations regarding her inconsistent statements as evidence that Tate had a history of exaggeration and to conclude from that history that her testimony was less than reliable.

In her arguments to this court regarding the credibility determination Tate overlooks the ALJ's additional discussion regarding the inconsistent statements she gave to various doctors regarding her education level. As the ALJ points out, Tate wrote in a disability report that she had completed the twelfth grade, (id. at 120), told Dr. Yomtoob that she completed only the eleventh grade and had never taken the GED test despite taking GED classes, (id. at 401), and told Dr. Rana that she obtained her GED, (id. at 404). The ALJ cited this inconsistency as another reason to find that Tate's testimony "may not be entirely reliable." (Id. at 28.) Because his observations are backed up by the record evidence, they add a layer of support to his credibility determination that Tate has ignored.

Next Tate argues that the ALJ erred by putting too much weight on her daily activities in finding her testimony incredible. Although she is correct that the Seventh Circuit has criticized the tendency among ALJs to put too much emphasis on a claimant's ability to perform daily activities or to equate necessary activities of

daily living to the ability to perform full-time work, *see, e.g., Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), the ALJ committed neither of those transgressions here. Instead of finding that someone with Tate's alleged pain level could not perform the daily activities she described, the ALJ found that Tate's description of her daily activities was inconsistent, noting that her hearing testimony conflicted with her previous self-reports regarding her ability to cook and eat meals. (A.R. 27-28.) Tate's assertion that the ALJ put too much weight on this factor is belied by his explicit notation that he considered her daily activities less important than the other factors he discussed in his decision. (Id.) Accordingly, Tate has not shown that the ALJ's treatment of her daily activities renders his credibility assessment patently wrong. *See Elder*, 529 F.3d at 413-14.

In her reply brief, Tate makes a number of arguments for the first time related to the idea that the ALJ should not have held against her the lack of medical records verifying that she sought treatment for her symptoms. Although arguments raised for the first time in a reply brief are waived, *see Frey v. EPA*, No. 13-2142, ___F.3d___, 2014 WL 1713409, at *11 n.2 (7th Cir. May 1, 2014), in the interest of completeness the court notes that Tate's new arguments also are unavailing. According to Tate, the ALJ unfairly drew a negative inference from her failure to take medications for her mental-health conditions because some of the records he points to predate her disability onset date. But the ALJ noted that Tate's medical records reflect that she was not on any antidepressants in December 2008 or July 2009 (after her onset date), despite her testimony that she had been

seeing Dr. Gartel for psychiatric medications since October 2008 (she also testified that she had been taking depression medication since March 2008). (A.R. 28, 421, 423, 452.) It is this discrepancy that the ALJ held against Tate. And although an ALJ typically should explore why a claimant does not take medications before holding that failure against her, *see Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009), here the ALJ reasonably explained that it was not the failure to take medication, but the discrepancy between Tate's testimony and the records describing her medication history that led him to find her credibility lacking. To the extent Tate argues that the ALJ should have considered that her somatoform disorder caused her to seek treatment for physical symptoms rather than the underlying mental disorder, she has neither explained why the medical record documenting her attempts to seek treatment following her April 2008 hospitalization is so sparse nor pointed to any records substantiating her assertion. In short, the ALJ gave a remarkable number of well-supported reasons why he decided to discount Tate's testimony. Accordingly, this court will not disturb his credibility determination.

## B.    RFC Assessment

In challenging the ALJ's RFC assessment, Tate first argues that the ALJ failed to provide a logical bridge between the evidence and the assessed mental limitations. Specifically, she argues that the ALJ did not give an "adequate rationalization" for his findings that Tate has "mild moderate limitations" in social functioning, suffers "moderate difficulties" in concentration, persistence, and pace,

and experienced no episodes of decompensation. (R. 16, Pl.'s Mem. at 10.) As an initial matter, it should be noted that these assessments appear in the ALJ's step-three analysis, not in the RFC assessment. (A.R. 19-20.) Nowhere in her brief does Tate argue that her mental impairments meet or equal a Listing, so it is unclear how errors at this stage would necessitate a remand or reversal.[3] But even overlooking that issue, Tate's arguments are unconvincing.

Tate argues that the ALJ's conclusion that she has a "mild moderate" limitation in social functioning is unsupported by substantial evidence because Dr. Gartel noted that she experienced moderate difficulties in that domain. (A.R. 19.) As the government points out, it is fairly clear that the ALJ's use of the phrase "mild moderate" is a typographical error. The ALJ wrote that he was willing to give Tate and Dr. Gartel "the benefit of every doubt" on this issue, and said that he agrees with Dr. Gartel's assessment of her social functioning. It is thus safe to assume that he intended to write that her limitation in social functioning is moderate. *See Pawlowski v. Astrue*, 800 F.Supp.2d 958, 967 (N.D. Ill. 2011) (refusing to remand based on an obvious typographical error). Either way, whether Tate had a "mild moderate" or moderate limitation in this domain makes little difference because to equal a Listing for affective disorders requires "marked" limitations in two domains or at least one domain along with repeated episodes of

---

[3] Confusingly, in her reply brief Tate asserts that she "makes no argument . . . that she met a listing" but also accuses the ALJ of engaging in "harmful error" by supposedly not relying on any expert in analyzing whether she meets Listing 12.04. (R. 26, Pl.'s Reply at 6.) It is unclear how an ALJ can commit harmful error in analyzing a Listing the claimant concedes she does not meet.

decompensation of an extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04(B). Tate has not even attempted to argue that she meets those standards. Nor has she argued that the ALJ's RFC limiting her to only occasional contact with the general public fails to accommodate her moderate limitation in this domain. (A.R. 20.)

Tate argues next that the ALJ erred in finding that Dr. Gartel concluded that she has only moderate limitations in concentration, persistence, or pace. Dr. Gartel marked a box on the two RFC forms she completed saying that Tate has "frequent" limitations in that domain, and according to Tate, "frequent" translates to a "marked" rather than a "moderate" limitation. She cites no authority to support that proposition. As the government points out, the Listings define "marked" limitations in this domain not by the frequency of interference, but by the nature and degree of the deficiency. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(C)(3). And again, given that Tate has not argued that her condition meets a Listing, it is unclear how the difference between findings of a moderate or marked limitation in this domain has any substantive impact on the ALJ's conclusion that she is not disabled.

Tate also argues that the ALJ committed reversible error in finding that she experienced no episodes of decompensation of an extended duration when Dr. Gartel indicated in her 2008 and 2010 RFC assessments that she experienced repeated episodes of decompensation. Again, the ALJ analyzed her episodes of decompensation in the context of the step-three analysis. At this stage, the Listings

define episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(C)(4). Such episodes "ordinarily require increased treatment or a less stressful situation" and can be "inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system." *Id.* Episodes of decompensation are considered to be of extended duration if they last for two weeks or more. *Id.* Tate points to no evidence showing that she experienced any episodes of decompensation beyond Dr. Gartel's two RFC forms, on which she checked a box saying she had experienced three or more episodes. (A.R. 206, 432.) Nothing on the form sheds any light regarding the duration of those episodes, let alone supports her assertion that the episodes of decompensation were of extended duration. (Id.) There are no accompanying medical records suggesting that Tate's medication regime changed or that she was instructed to seek out a more structured psychological support system. And again, even Tate does not argue that she meets the Listings criteria with respect to her depression or anxiety.

To the extent that Tate's argument is an attempt to translate the ALJ's reasoning at step three to her RFC assessment preceding step four, the ALJ's assessment of her mental impairments at the latter stage is amply supported by substantial evidence. The ALJ assessed Tate as having limitations including the inability to understand, remember, and carry out detailed and complex job instructions, the inability to engage in intense focus or concentration for extended

periods, and the need to avoid more than occasional contact with the public. (Id. at 20.) Tate argues that the ALJ failed to explain why he did not adopt each one of Dr. Gartel's specific findings, but the ALJ gave several reasons for discounting them, including the lack of accompanying treatment notes, the contradiction between Dr. Gartel's findings and those of other evaluating psychologists, records showing that Tate had refused psychiatric help in the past, and the conclusory nature of Dr. Gartel's assertions in the RFC forms. (Id. at 29.) The ALJ explained that he assessed the limitations that he found supportable, giving Tate's testimony and Dr. Gartel's statements the benefit of the doubt. (Id.) In other words, those limitations he did not incorporate are those he found insufficient to raise even a doubt in his mind for the reasons he explained. Contrary to Tate's suggestion, the ALJ was not required to go through Dr. Gartel's entire checklist of limitations and explain why he rejected each one. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (noting that ALJ "need not specifically address every piece of evidence"). Because the reasons he gave for assessing Tate's limitations are supported by the record, Tate has not shown that the ALJ committed reversible error in evaluating her mental RFC.

Tate's second attack on the ALJ's RFC assessment comes in the form of her argument that the ALJ erroneously discounted the opinion provided by her treating physician, Dr. Nagarajan, regarding her physical RFC. As Tate points out, Dr. Nagarajan filled out an RFC form assessing Tate as having greater physical limitations than those assigned by the ALJ. Although a treating physician's opinion

may be entitled to deference even where it is inconsistent with other record evidence (and therefore not entitled to controlling weight), *see* 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996), to merit such deference the opinion must "be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints," *Rice*, 384 F.3d at 371. Tate argues that the ALJ should have given more deference to Dr. Nagarajan as her treating physician, and asserts that the ALJ gave an insufficient reason for discounting his RFC opinion.

In support of her argument, Tate quotes the ALJ as saying that he "has given little weight to the opinion of the claimant's treating physician Dr. V. Nagarajan . . . This doctor's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive." (R. 16, Pl.'s Mem. at 13 (quoting A.R. 29).) Tate's use of an ellipse in this quote gives the sense that she seeks to bury the ALJ's reasoning while at the same time faulting him as providing an inadequate explanation. What she omitted from the quoted portion of the ALJ's language is the following line: "The form specifically notes that it was completed and filled out as the claimant requested it be filled in for her." (A.R. 29.) Indeed, Dr. Nagarajan specifically wrote on the bottom of the RFC assessment, "Form filled in as patient requested to fill it up for her." (Id. at 207.) The ALJ was well within his discretion to find that this statement casts doubt on the credibility of the opinions Dr. Nagarajan memorialized on the RFC form. As numerous cases have explained, a treating physician may find himself in a situation where he feels

compelled to do a favor for a needy patient and "it is not unheard of that a personal physician might have been leaning over backwards to support the application for disability benefits." *Scheck*, 357 F.3d at 702 (internal quotation omitted); *see also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (noting that a treating physician's opinion may "be unreliable if the doctor is sympathetic with the patient"); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (noting risk that treating doctor will want to do a favor for a client in filling out RFC forms); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation."). Here, Dr. Nagarajan could not have been clearer that he filled out the form as Tate asked him to, sending an explicit signal to the ALJ that the opinion conveyed on the form is based on her subjective complaints and is not unbiased. The ALJ was entitled to view that signal as a reason to discount the opinions Dr. Nagarajan expressed on the form. Tate's decision to omit the ALJ's reasoning from the discussion in her opening brief of the treating physician rule renders her argument at best, unpersuasive. For all of these reasons, Tate has not shown that the ALJ committed reversible error in assessing her RFC.

## C. The Step-Four Analysis

Tate's last argument is that the ALJ's finding at step four that she can return to her previous relevant work as a packaging machine operator is unsupported by substantial evidence. Tate points to the ALJ's finding that she has a moderate limitation in concentration, persistence, or pace, and argues that there is no

rationalization for the VE's testimony—on which the ALJ relied at step four—that this limitation can be satisfied by placing the claimant in an unskilled position. According to Tate, "the ability to focus and concentrate is not correlated with unskilled work." (R. 16, Pl.'s Mem. at 15.)

The specifics of Tate's argument here are hard to pin down, but to the extent that she is challenging the content of the hypothetical, Tate has not shown that the VE failed to take into account all of the limitations the ALJ found to be credible. *See Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) (noting that ALJ may rely on VE testimony reflecting impairments to the extent ALJ found them supported by substantial evidence). The Seventh Circuit has made clear that the ALJ must ensure that the VE considers limitations in concentration, persistence, and pace in testifying regarding the kind of job a hypothetical claimant can perform. *See O'Connor-Spinner*, 627 F.3d at 619. Incorporating a limitation to unskilled, simple, routine work into the hypothetical instead of an express acknowledgment of a limitation in concentration, persistence, and pace may not be enough to ensure that the VE took all of a claimant's limitations into account. *See Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008). But the court has been willing to overlook an ALJ's failure to expressly include the concentration limitation in the hypothetical in cases where the VE's familiarity with the claimant's medical limitations can be assumed from the fact that he was present for testimony regarding the issue or where the VE reviewed the

medical record independently and so was aware of the relevant limitation. *See O'Connor-Spinner,* 627 F.3d at 619.

Contrary to Tate's argument, the ALJ did not account for what he considered to be her moderate limitation in concentration, persistence, and pace by posing a hypothetical to the VE restricting the claimant to unskilled, simple work. Instead, the ALJ expressly worked the concentration limitation into the hypothetical by asking the VE to consider a person who "is unable to understand, remember, and carry out detailed and complex job instructions, [and] is not suited for work requiring intense focus or concentration for extended periods." (A.R. 474.) The Seventh Circuit has not insisted that the specific terminology "concentration, persistence, and pace" be used in the hypothetical. *See O'Connor-Spinner*, 627 F.3d at 619. In fact, several courts have held that the same language the ALJ used in the hypothetical here is sufficient to alert the VE to or otherwise account for a claimant's limitation in concentration, persistence, or pace. *See Triplett v. Colvin*, No. 12 CV 4382, 2013 WL 6169562, at *11 (N.D. Ill. Nov. 25, 2013); *Jones v. Astrue,* No. 11 CV 4827, 2012 WL 2018534, at *9, (N.D. Ill. June 5, 2012); *Willford v. Astrue*, No. 10 CV 1494, 2012 WL 775160, at *6 (D. Or. Mar. 5, 2012). And even if this language did not suffice to alert the VE to the full scope of Tate's limitation in this domain, the VE testified on the record that she had independently reviewed the entire exhibit file and was present throughout Tate's testimony. (A.R. 471.) In all of these ways, the record reflects that the VE was aware of the full scope of Tate's concentration limitation and accounted for that limitation in testifying that she can

return to her past relevant work as a packaging machine operator. *See O-Connor-Spinner*, 627 F.3d at 619.

To the extent that Tate is arguing that the VE's testimony lacks support because she testified that unskilled work satisfies a hypothetical claimant's inability to engage in intense focus or concentration, (R. 16, Pl.'s Mem. at 14), that characterization of the VE's testimony does not reflect what she actually said. The VE did not testify that a person with the concentration limits the ALJ described could do any unskilled work generally. Rather, she testified that such a person could perform the job of packaging machine operator specifically. The VE explained that while a person lacking the ability to do work requiring intense focus or concentration for extended periods would not be able to engage in skilled or semi-skilled work, the hypothetical individual "would still be able to perform in the simple, unskilled job of packaging machine operator." (A.R. 474-75.) Tate has made no attempt to show that the packaging machine operator position in particular is incompatible with the degree of the concentration limit the ALJ found credible here. *See Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (noting that even where there are a number of jobs beyond the capability of someone limited to unskilled work, an ALJ may rely on VE testimony specifying that a particular unskilled job is appropriate for individuals with claimant's specific limitations).

Finally, to the extent Tate argues that the ALJ erred in failing to resolve a conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"), she has not explained what that conflict is, beyond pointing to the specific

vocational preparation level that corresponds to unskilled work. (R. 16, Pl.'s Mem. at 14); *see also* SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000) (noting that "unskilled work corresponds to an SVP of 1-2"). An ALJ has a duty to ask the VE if her testimony conflicts with the DOT and if so, to clarify the conflict. *See Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008). But in a case where the claimant is represented by an attorney and the attorney does not object to the VE's testimony, the ALJ is only obliged to ask about apparent conflicts. *Id.* at 463. Here, Tate's counsel did not object to the VE's testimony or point out any conflicts during the hearing. And in her briefs Tate has not pointed to any apparent conflict. *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (noting that ALJ error in failing to ask about conflicts between VE testimony and DOT was harmless where no actual conflict exists). Although Tate lists a number of duties a machine packaging operator must perform and asserts that they "clearly require intense focus and concentration," she has not pointed to any DOT evidence that would support her assertion on that point. Apparent conflicts are those which "were obvious enough that the ALJ should have picked up on them without any assistance." *Overman*, 546 F.3d at 463. Tate's blanket assertions regarding the amount of focus and concentration required to perform the tasks involved in her past relevant work does not meet that standard. Because she has not identified any apparent conflict between the DOT and the VE's testimony, there is no need to remand the case to have the ALJ explore the issue further. *See Weatherbee*, 649 F.3d at 572. For all of

these reasons, the court concludes that the ALJ's step-four analysis is supported by substantial evidence.

## Conclusion

The record in this case demonstrates that Tate has been dealt a difficult hand involving a number of stressors that have impacted her health. But the ALJ's decision concluding that those impacts do not render her disabled builds a solid logical bridge between the record and his conclusion. He reviewed and described the medical evidence in detail, gave numerous, well-supported reasons for his credibility finding, and reasonably explained his determination that Tate can return to her past relevant work. For all of these reasons, Tate's motion for summary judgment is denied, the Commissioner's motion is granted, and the Commissioner's decision is affirmed.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**